AO 91 (Rev. 11/11)   Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Northern District of California

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Tam Nguyen, | ) | Case No. |
| | ) | |
| | ) | |
| | ) | |
| _Defendant(s)_ | ) | |

FILED

SEP - 4 2019

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

3  19  71453

~~UNDER SEAL~~

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ November 15, 2017 _____ in the county of _____ San Francisco _____ in the

_____ Northern _____ District of _____ California _____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 42 U.S.C. § 1320a-7b(b) | Criminal penalties for acts involving Federal health care "Anti-Kickback Statute." |

This criminal complaint is based on these facts:

Please see attached affidavit.

☑ Continued on the attached sheet.

Approved as to form:

_____
WILLIAM FRENTZEN
Assistant United States Attorney

Sworn to before me and signed in my presence.

Date: 9/3/19

City and state: _____ San Francisco, California _____

_____
_Complainant's signature_

Janette Spring, Special Agent - FBI
_Printed name and title_

_____
_Judge's signature_

Hon. Joseph C. Spero, U.S. Chief Magistrate Judge
_Printed name and title_

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Janette Spring, Special Agent with the Federal Bureau of Investigation ("FBI") being first duly sworn, hereby depose and state as follows:

## I.   INTRODUCTION

### A.   SYNOPSIS

1.      I submit this affidavit in support of a criminal Complaint for Dr. Tam NGUYEN ("NGUYEN").

2.      There is probable cause to believe NGUYEN engaged in a scheme to defraud Medicare by receiving cash kickback payments in exchange for the referral of home health and/or hospice patients in violation of  42 U.S.C. § 1320a-7b(b), the anti-kickback statute.

3.      As part of this investigation, the Agents have obtained information from the cooperation of an FBI confidential human source ("CW-1")[1] and evidence obtained by an FBI undercover employee ("UCE"):

4.      An identified co-conspirator introduced NGUYEN to CW-1 and UCE as an individual willing to accept kickbacks in exchange for the referral of patients.

5.      During the course of the investigation, UCE held multiple in-person audio and video recorded conversations with NGUYEN, in 2017 and 2018, in which NGUYEN received kickback payments in the form of cash in exchange for the referral of home health and/or hospice patients.

---

[1] CW-1 has provided information and services to the FBI over approximately two years and has received no monetary compensation or other consideration from the FBI in exchange for the information and services. However, CW-1 was employed by a home health care agency ("HHA Alpha"), which served as a cooperating entity supporting the FBI's undercover operation.  As a result of the undercover operation, patient numbers and/or revenue to CW-1 and CW-1's HHA may have increased.  These potential increases to CW-1's HHA may have provided benefit to CW-1 by improving his/her standing with the employing HHA.  A criminal background check of CW-1 revealed convictions for embezzlement, grand theft, and an arrest for false claim to citizenship.  CW-1 is an undocumented immigrant who entered the United States illegally and by presenting false identifying documents to a CBP officer.  The CW-1 later falsely denied having possessed false identifying documents when interviewed by immigration officers.  Although CW-1 is a removable alien, removal has been deferred under the Convention Against Torture.  The CW-1 may have an incentive to curry favor with federal law enforcement because of his immigration status. After the conclusion of this undercover operation, FBI Agents became aware that during the undercover operation but after HHA Alpha was no longer accepting patient referrals from targets of the investigation, CW-1 was believed to have tried to use his/her role as a source to threaten an individual – with whom he/she had a personal dispute – with a law enforcement investigation into the practices of this individual. To my knowledge, those threats were never carried out. CW-1 is not currently the subject of any pending criminal charges.

## B. BACKGROUND OF LEGAL FRAMEWORK AND INVESTIGATION

6.       Starting in the 1970s, Congress created, amended, and strengthened the "Anti-Kickback Act", currently United State Code, Title 42, Section 1320a-7b(b). The relevant language of the statute is listed below. In essence, the law criminalizes influencing referrals for federally funded health care through payments. The legislative history revealed Congress was deeply concerned the normalization of kickbacks in federally funded health care programs would lead to fraud nd an undermining of the quality of patient services since "operators become more concerned with rebates than with care. [2]" FBI Agents began looking into kickbacks in the San Francisco Bay Area, specifically in the fields of home health and hospice. Their investigation arose from concerns of false billing, referrals without patient care in mind, that health care providers would have a willingness to expose their patients to unnecessary treatments and that certain home health agencies ("HHAs") would have a willingness to bill for, but not provide, necessary services.  The preliminary investigation into kickbacks occurring in the Bay Area in the fields of home health and hospice revealed that the above concerns were indeed occurring. Some of the most egregious examples uncovered by the investigation included doctors who referred patients to hospice care in exchange for kickbacks while demanding a "longevity" bonus – meaning the doctor would financially benefit the longer a patient remained on hospice. Since hospice is generally meant for palliative care without curative intent, this system could encourage doctors to abandon curative options earlier with potentially life threatening outcomes.[3]

7.       An undercover operation was selected as the means of investigating kickbacks. From training and experience, the investigators understood that health care providers and HHAs shrouded their activities in secrecy. Typically, health care providers were given kickbacks in the form of cash payments made in closed door meetings between themselves and HHA representatives. Some used bogus medical directorship/consultant contracts to disguise kickbacks as payments for seemingly legitimate, but actually

---

[2] "Kickbacks Among Medicaid Providers", Senate Report 95-320, 1977.

[3] In fact, throughout the course of the investigation, four of the targets, while negotiating kickback payment amounts, discussed similar "longevity" bonuses. UCE agreed to these bonuses or entertained further discussion to potentially identify any such referrals by proactively identifying at-risk patients. During the course of the investigation, no such longevity bonus referrals were made to the UCO.

non-existent, services. Given the expected closed nature of the transactions and the relatively traceless nature of cash payments, traditional documentary and other overt investigative techniques were deemed to be ineffective. An undercover operation ("UCO") was considered as the most efficient and most successful means to gather direct evidence of the payments and the corrupt intent of the kickback payments

8.      Around July 2016, two employees of a known Bay Area home health agency ("HHA Alpha") made a complaint to Health and Human Services Office of Inspector General ("HHS-OIG") regarding payments of kickbacks to doctors by other HHAs in the Bay Area. One of the two agreed to serve as a cooperating witness ("CW-1"). CW-1 was paired with an undercover FBI agent ("UCE"), based in San Francisco, who would portray himself/herself as someone representing investors, intent on acquiring HHA Alpha and seeking to expand HHA Alpha's patient population through illegal kickbacks. UCE often communicated with targets in furtherance of the UCO while in San Francisco. The UCO sought to investigate predicated targets and to use predicated targets to refer UCE to other violators who the targets believed to be engaged in similar conduct.

9.      In designing the UCO, investigators learned health care providers were weary of potential legal risks that caused them to be unwilling to accept kickbacks from an unknown undercover agent without an introduction from a known member of the industry. Further, the nature and size of the kickbacks were dependent on the types of HHA services required. For example, certain types of insurance and services were reimbursed at a higher rate, which in turn would lead to higher kickbacks. Many health care providers were also quite concerned with patient satisfaction, partially to avoid a disgruntled patient from questioning the corrupt HHA referral. Therefore, the ability to provide specific details about services, accepted insurance plans, and patient satisfaction was critical to both gaining the initial introductions and to allowing the UCO to expand. The involvement of a vetted HHA would facilitate entry of the UCO and allow kickback referrals to be diverted away from predicated HHA companies. Further, the care provided by the vetted HHA could be monitored and reviewed.

10.      In keeping with those goals, HHA Alpha effectively served as a cooperating entity through its management and its participation in the UCO.  The FBI investigation was partly based upon

analysis of so-called outlier data – data showing abnormal and potentially illegal conduct – among HHAs and doctors as well as through interviews. Based on examination of the data and interviews, HHA Alpha did not fall into the profile of a likely kickback offender.  Checks of FBI databases did not reveal HHA Alpha as a prior or current subject of any investigations.  Additionally, the FBI consulted with HHS-OIG and determined HHA Alpha was not a prior or current subject of any investigations. From the founding of HHA Alpha in 2009 until the initiation of the UCO, Medicare received two complaints[4], which were later deemed to be unsubstantiated.  Additionally, HHA Alpha's owner was aware that CW-1 would be cooperating with an investigation and the patient paperwork and referrals to HHA Alpha during the UCO were required to be brought to the attention of the investigating agency.  Patients referred to HHA Alpha by physicians and others receiving payment from FBI through the UCO, (1) were contacted by an employee of HHA Alpha to obtain their consent for treatment by HHA Alpha, (2) as a result of this consent and intake process, some patients ultimately did not receive treatment from HHA Alpha because they declined treatment, preferred an HHA of their own choosing, or medical evaluation determined treatment was inappropriate, (3) HHA Alpha was made aware of patients that were referred through the course of the UCO, and (4) FBI conducted interviews of all available patients referred to HHA Alpha and there were no serious allegations of failure in patient care.  [5]  During the course of the UCO, there was one complaint regarding patient care provided by HHA Alpha made by a recently hired, and then fired employee, but an investigation by the California Department of Public Health did not result in any negative finding against HHA Alpha. No other complaints about HHA Alpha were reported to Medicare through the duration of the UCO. During the course of the UCO, a total of 27 subjects were paid kickbacks and referred patients to HHA Alpha. At no time during their meetings with CW-1 and/or UCE

---

[4] An anonymous complaint filed in 2016 alleged a durable medical equipment kickback scheme, which was closed due to insufficient information.  In 2015, Medicare closed a patient allegation of false billing by HHA Alpha after a review of documents provided by HHA Alpha justified the billing.

[5] Only three patients out of 129 interviewed by FBI complained and the complaints consisted of (1) early discontinuation of treatment, (2) a nurse should have shown up more often, and (3) physical therapy should have been longer.  Of all patients referred to HHA Alpha by targets of the investigation during the UCO, the FBI was unable to interview 31 patients due to the patients passing away in hospice care or because the patients could not be located – generally international patients.  As to those patients, no complaints regarding patient care were ever filed against HHA Alpha.

did the subjects express any concerns regarding the treatment of their patients by HHA Alpha nor notify

that any patient complaints had been received. Further, none of the subjects indicated they were aware of

any illicit conduct by HHA Alpha prior to or during the UCO.

### C. AGENT QUALIFICATIONS

11. I am a Special Agent of the FBI and have been so employed for approximately three

years. I am currently assigned to the Complex Financial Crime Squad of FBI's San Francisco Field

Division. As part of my assigned duties, I investigate possible violations of federal criminal law,

specifically investigations involving white collar crime. I have received specialized training in health care

fraud matters including, but not limited to, Anti-Kickback, Mail Fraud, Wire Fraud, and False Claims. I

have participated in the execution of various arrests and search warrants in which business and personal

documents, bank records, computers, and other evidence of fraud and other crimes have been seized.

12. In the course of this investigation and my investigation of other health care fraud

schemes, I have (1) interviewed numerous persons; (2) reviewed numerous records and pertinent data; (3)

read interviews and other reports written by other law enforcement officers; and (4) become familiar with

the manner and means by which health care fraud schemes are operated including violations of 42 U.S.C.

Section 1320a-7b and 18 U.S.C. Section 371.

13. This affidavit is intended to show merely that there is sufficient probable cause for the

requested Complaint and arrest warrant and does not set forth all of my knowledge about this matter.

Unless specifically indicated otherwise, all conversations and statements described in this affidavit are

related in substance and in part only.  Where excerpts of transcripts of audio recorded conversations are

presented, they represent my best effort at this time to transcribe such recordings and I believe them to be

accurate in substance.

### D. COMPLAINANT

14. Dr. Tam NGUYEN, is a 44 year old physician with a medical practice in San Jose, CA.

During the course of the investigation, NGUYEN accepted $20,000 in kickback payments in exchange for

patient referrals.

### E. STATUTE VIOLATED

15. **Title 42, United States Code, Section 1320a-7b(b)(1)(A)**, in relevant part, makes it a crime for any person to knowingly and willfully solicit or receive any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

## II.      PROBABLE CAUSE

### A.   NGUYEN IS INTRODUCED TO CW-1 AND UCE BY A CO-CONSPIRATOR

16. In January 2017, CW-1 identified Mervina DEGUZMAN ("DEGUZMAN") as a nurse engaged in kickback schemes.

17. Because of DEGUZMAN's position as a nurse, DEGUZMAN had numerous relationships with physicians in the San Jose, CA area, including NGUYEN. DEGUZMAN used her connections to engage in kickback schemes that would direct patients to certain facilities in exchange for cash.

18. The UCO initially focused on DEGUZMAN and individuals believed to be accepting kickbacks from her. NGUYEN was later introduced to CW-1 and UCE by DEGUZMAN.

### B.   DEGUZMAN ARRANGES THE KICKBACK SCHEME

19. During a recorded meeting on May 15, 2017, CW-1 and UCE recorded a meeting with DEGUZMAN to propose a business partnership. During the meeting, CW-1 explained s/he and a business partner (UCE) would be purchasing HHA Alpha and were looking to increase the patient population prior to the purchase. As part of their agreement, DEGUZMAN would introduce CW-1 and UCE to individuals willing to steer patients to HHA Alpha in exchange for kickbacks. Below is an excerpt of the aforementioned exchange:

| | |
|---|---|
| UCE: | Especially if we're willing to pay, if you know what, as you said you know what the relationships are now, and if we add another 50 to that, 100 to that, they'll be like "yea I'll break you off a little". Does that sound fair? |
| DEGUZMAN: | Yeah. |

| UCE: | Ok. So that's what we looking for. And…so, I'd be…I don't want you to have to drive everywhere under the sun. But I definitely need your help to burst through the door. |
|---|---|
| DEGUZMAN: | Ok. |

20. On or about November 6, 2017, CW-1 contacted DEGUZMAN on her cellular telephone and recorded their discussion about an upcoming meeting with another physician. During the call, DEGUZMAN advised CW-1 how to draft a fraudulent consulting contract as a way to disguise kickback payments as legitimate work as paying for patients was illegal, stating "So so so but in the mean time you can say that you can do a contractual, contractual work, like her work, her paid work is based on caseload, but it's it's the politically correct way to say, you know? They're not paid patients, but you know you cannot pay for a patient, cause it's illegal, but then you can pay for labor."

21. On or about November 11, 2017, DEGUZMAN sent CW-1 a text message offering to introduce CW-1 and UCE to NGUYEN (referred to as "Dr. Tam" in DEGUZMAN's message and referred to as "NGUYEN" herein). DEGUZMAN offered to accompany CW-1 during a visit to NGUYEN's office, stating "Ok I will have you deliver to Dr. Tam, which will give you and [UCE ] the chance to talk to him". CW-1 asked DEGUZMAN to "talk to him [NGUYEN] before and explain what we are doing so it's not too uncomfortable for us" to which DEGUZMAN responded "Absolutely!" Based on this exchange, CW-1 understood DEGUZMAN was willing to discuss the kickback scheme with NGUYEN prior to their meeting.

## C. NGUYEN IS INTRODUCED TO UCE BY A CO-CONSPIRATOR

22. On November 15, 2017, DEGUZMAN accompanied CW-1 to a meeting with NGUYEN at NGUYEN's medical office in San Jose, CA. The purpose of the meeting was to introduce CW-1 to NGUYEN and discuss the kickback for patient referral scheme. During the meeting, DEGUZMAN suggested CW-1 avoid a "paper trail" by paying NGUYEN in cash, thereby concealing their illicit relationship. At the end of the meeting and in the presence of DEGUZMAN, CW-1 paid NGUYEN

$1,000 cash as a good faith payment for starting their kickback relationship. Below is an excerpt of the aforementioned exchange:

| | |
|---|---|
| DEGUZMAN: | And and you can't do transactions with paper trail? |
| CW-1: | No. Unless you want to. Unless there is no mind and my name is not on there, do it [laughs]. |
| | … |
| DEGUZMAN: | cause the only two ways they can do it is either you know they compensate for your time for cash or they do the…they sign you under the merger company or whatever he calls his company. |
| CW-1: | If you have to do checks we can do that but again…why keep a paper trail? |
| DEGUZMAN: | I know I think the cash is better. |
| | … |
| DEGUZMAN: | So just like a couple a month…I mean like a couple patients a month average is all. |
| CW-1: | We do two to three and and then we raise is slowly and then in 11 months if you want to be exclusive. |
| DEGUZMAN: | Wait til the acquisition basically to grow. |
| | … |
| CW-1: | So what I have [unintelligible] as a thank you, uhh, good faith, at least you know, we're not lying, we're not making any stupid mistakes and then we can sit down with Mervina and figure out how we can do it. If you have different numbers, we can talk about those numbers. It's kind of an uncomfortable topic, but be open be more communicative so we understand, so you don't feel like hey I'm low-balling you or I'm just not doing what I'm supposed to do cause I know what the market is doing outside. |
| DEGUZMAN: | Yeah. |
| CW-1: | Better that we don't want to get into a bidding war, so thanks boss. |
| NGUYEN: | Thank you. |
| CW-1: | I will leave this for you. |

...

| NGUYEN: | What's this? |
| CW-1: | A thousand dollars. |
| NGUYEN: | Oh. |
| CW-1: | Just a good faith, like hey we are not bullshitting. |

23.  Following the meeting on or about November 17, 2017, CW-1 received a text message from NGUYEN. In the message, NGUYEN advised CW-1 that he was sending patient referral to HHA Alpha, "Please check your fax it [the patient referral paperwork] should come and hope you can open the case".

## D.  NGUYEN ACCEPTS KICKBACKS IN EXCHANGE FOR THE REFERRAL OF MEDICARE PATIENTS

24.  During a recorded meeting on November 30, 2017, CW-1 introduced NGUYEN to UCE . During their meeting, NGUYEN and UCE negotiated their kickback arrangement. NGUYEN offered to use his connections to Medicare patients as a way to refer patients to HHA Alpha. In exchange, UCE offered NGUYEN $1,000 per month for the patient referrals. Below is an excerpt of the aforementioned exchange:

| NGUYEN: | Just an FYI I sit on the board of several, I have very good relationships with many Medicare, HMO. A lot of 'em I have very strong relationships with. One coming up next year, Brand New Day, and I am pretty connected. |
| CW-1: | Maybe you can connect us too. |
| UCE: | You are familiar with this business, we are new to you, and we don't want to insult you. A lot of doctors are not used to negotiating. Is there a rate, maybe one or two a month, is there a rate you are comfortable with. Our typical... |
| NGUYEN: | It's a relationship, in that relationship we have to have trust, if you jack me up, you gonna... |
| UCE: | But that is exactly it, the reason why I ask is we can recommend what we normally do, I don't want someone to get into a relationship where they feel short changed and not building the good will we are looking for. This is all about the good will we are looking for. Typically at the beginning level we got one |

|  | thousand dollars. Is that comfortable for you, would that be fine? |
|---|---|
| Nguyen: | It should be fine. |

25. During the course of the UCO, NGUYEN referred over 40 patients to HHA Alpha, including at least ten Medicare patients. NGUYEN met regularly with CW-1 and UCE and accepted $20,000 in kickback payments in exchange for patient referrals.

## III.     PROBABLE CAUSE FOR THE VIOLATION

### A.  TITLE 42 UNITED STATES CODE, SECTION 1320A-7B(B)(1)(A), THE ANTI-KICK BACK STATUTE

26. Title 42, United States Code, Section 1320a-7b(b)(1)(A), in relevant part, makes it a crime for any person to knowingly and willfully solicit or receive any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

27. Based on all of the foregoing, probable cause exists to believe that NGUYEN accepted kickback payments from UCE that were intended to induce NGUYEN to send patient referrals to HHA Alpha for home health and/or hospice services later billed to Medicare.

28. Medicare is a federally funded health care program, and the referral of patients to HHA Alpha by NGUYEN for home health or hospice services constitutes a referral, as defined by Title 42 United States Code, Section 1320a-7b(b)(1)(A).

29. Therefore, there is probable cause to believe that patient referrals sent to HHA Alpha by NGUYEN in exchange for cash payments from UCE meets the definition of a kickback payment and violates anti-kickback statute.

## IV.     CONCLUSION

30. Based on the foregoing, there is probable cause to believe NGUYEN accepted kickbacks in exchange for the referral of patients in violation of 42 U.S.C. § 1320a-7b(b)(1)(A).

## V.       REQUEST FOR SEALING

31.  Since this investigation is ongoing, disclosure of the Complaint, this affidavit, and/or this application and the attachments thereto will jeopardize the progress of the investigation.  Disclosure could result in the destruction of evidence, intimidation or collusion of witnesses, or the flight of a suspect.  Accordingly, I respectfully request the Court issue an order directing this Affidavit and any related documents be sealed until the further order of this Court.


_____
Janette Spring, Special Agent
Federal Bureau of Investigation


Sworn to and subscribed before me
this **3rd** day of September, 2019.


_____
HON. JOSEPH C. SPERO
United States Chief Magistrate Judge


11